### The L. S. & M. S. R. R. Co. v. Rebecca A. Hunter, Admx.

NEGLIGENCE OF CONDUCTOR—EFFECT.

> The conductor on a train is the only representative of the company who is in charge of the whole train, and by the law of Ohio is made the representative of the company in the management and control of the train, and therefore if he fails to give his engineer certain information which he received regarding the safe running of his train and a collision results from this failure and he receives injuries from which he afterwards dies, the representatives of his estate will not be entitled to recover any damages from the company because the injury received by the conductor from which he afterwards died resulted from his own negligence.

ERROR.

KING, J. ( orally ).

This case was submitted to us early in the term, and we have examined it with considerable care.

The plaintiff, as administratrix of the estate of William R. Hunter, deceased, brought her action against the Lake Shore & Michigan Southern Railway Co. to recover for his death, resulting, as alleged in the petition, from the negligence of the railway company.

William R. Hunter was the conductor of a passenger train running on the Flint & Pere Marquette Railroad, which, on the 28th of November, 1891, collided with a train on the Lake Shore road, in this city, by running into the rear end of it. That accident resulted in a considerable loss of life and injury to persons who were passengers on the Lake Shore train. Mr. Hunter, who was the conductor of the following train which ran into the Lake Shore train, was jostled about and thrown over on his side in the mail car, and received some injuries which it is alleged caused his death on the 13th of May, 1893, nearly 18 months thereafter.

There are many questions raised by this record—objections to testimony, to the charge of the court, to the giving of requests and failure to give requests, and that the verdict is against the evidence and the law. We do not find any substantial error in any of these questions that is worthy of discussion, except one; and that is, whether this judgment is sustained by the evidence and the law. That arises upon two grounds of objection to this judgment. One is, that the evidence does not show that Mr. Hunter died in consequence of the injuries which he received; and second, that the evidence does show that Mr. Hunter was himself negligent to an extent that contributed to the injury which he received. We think from this record, it is an exceedingly close question whether there is evidence here to show that Mr. Hunter died as the result of the injuries he received, but we are not disposed to disturb this judgment upon that ground. That he received some injury is certain, but just what the effect of it was is quite uncertain. However, that was fairly submitted to the jury, and they presumably found that he died as the result of the injuries which he received, and we are not prepared to disturb the verdict on that ground.

The second claim is more serious. Mr. Hunter was the conductor of the Flint & Pere Marquette train. He was, by the rules of his com-

pany, of the Lake Shore company, and by the law of the land, in Ohio at least, in charge of that train ; and the duty devolved upon him to attend to its running; to give orders not only to the brakemen and trainmen under his supervision, but also to the engineer. The facts show that Mr. Hunter's train come on the Flint & Pere Marquette road into Toledo, and was nine minutes late when it reached Air Line Junction, which is the point where the roads which branch out and come in from the north meet with the Air Line road coming from the west. There were a number of trains that came into the city at about that hour on the different branches of the Lake Shore road aside from the one of which he had charge, which came upon the Lake Shore tracks at Monroe. When he arrived at Air Line Junction, his train was nine minutes late. He knew there were three trains on the Lake Shore road arriving very near that point of time, and he knew that one of them, known as No. 6—an express, coming from the west—was due there one minute after his train was due, but his train was nine minutes late. By the time table he would know that that train, if it were on time, had passed Air Line Junction about eight minutes ahead of him. He had passengers on his train to take this No. 6 train at Toledo. He also had an engineer that had never run into Toledo on any passenger train, I think, or at least had not been running under him at all. Sometime before he reached Toledo, probably at Monroe, Hunter informed the engineer that he had passengers for No. 6, and it was necessary for him to catch that train ; and the engineer, it seems, undertook to run the train so that it might overtake No. 6, if possible. When he arrived at Air Line Junction, as I say, he knew that his own train was nine minutes late, and he found out, as he himself testified before the coroner at the inquest—I think the only time when he gave evidence in the case—that No. 6 was also late, but that it had gone in ahead of him two minutes, as he says in one place, and in another a few minutes, but he evidently regarded it as two or three minutes. The engineer, it will be assumed, knew the time tables of the company, and he knew, if he relied on the time tables of the company, that No. 6 would be about eight minutes ahead of him. The conductor then found that No. 6 was only two minutes ahead of him. That additional information which he obtained at Air Line Junction before the starting of his train he did not communicate to the engineer. The engineer proceeded on the assumption that No. 6 was on time, and he ran the train at the rate of 25 to 30 miles an hour between Air Line Junction and the tunnel under what is called the canal bed, a mile and a half from Air Line Junction. The conductor testifies that the speed was 25 miles an hour, and probably 30, and the engineer himself puts the rate of speed at 25 miles an hour at the highest. So he was running at a very rapid rate of speed, believing that No. 6 was eight minutes ahead of him, and knowing that two other trains, if they were on time, were also ahead of him. The congested condition of the tracks, as a matter of fact, caused No. 6 to stop just east of what is known as the tunnel—that is, between the tunnel and the depot. The evidence is that in daylight the engineer might have seen from Air Line Junction to the depot, if the tunnel was not in any way obstructed, by looking through the tunnel, through which ran double tracks; but the testimony all is that sometimes they would be obstructed. This was after dark, so that if there was any other train or smoke in the tunnel, he could not see through to the depot by means of the lights beyond. He ran down very nearly to this tunnel before he shut off his steam and slackened his

speed, and ran in and through the tunnel, and into the hind end of the other train, which was 300 or 400 feet beyond the tunnel, without observing that there was anything ahead of him.

There is no doubt but that this record discloses that the Lake Shore Railroad company were negligent, and would have been held liable as they were held, in actions brought against them by their own passengers. We think also that there is no doubt that if passengers on the F. & P. M. train had brought actions against the F. & P. M. Railroad company for injuries caused by that accident, they would have been entitled to recover against that road, regardless of the question whether passengers upon the Lake Shore would have been entitled to recover against that company also. It seems that in the trial of the cases that were brought against both roads, that the verdict of the jury resulted in a judgment against the Lake Shore and not against the F. & P. M. But that is not conclusive upon the question of negligence. If, as I say, passengers of the F. & P. M. had brought such an action, we cannot see why they would not have been entitled to recover against the railroad with whom they had contracted for passage, for the negligence of the conductor of the F. & P. M. train in running it. By the rules of that company the conductor and engineer were made jointly responsible for the safety of the train, and for running it with care. It is also true, as a matter of law, that the conductor is the only representative of the company who is in charge of the whole train, as has been held in this state as far back as 3 O. S., in the case of *R. R. Co.* v. *Keary*, 202, and in other cases. The court said on page 211 of the opinion cited:

"For this purpose the conductor is employed, and in this, he directly represents the company. They contract for, and engage his care and skill. They commission him to exercise that dominion over the operations of the train, which essentially pertains to the prerogatives of the owner; and in its exercise he stands in the place of the owner, and is in the discharge of a duty which the owner, as a man and a party to the contract of service, owes to those placed under him, and whose lives may depend on his fidelity. His will alone controls everything, and it is the will of the owner that his intelligence alone should be trusted for this purpose. This service is not common to him, and the hands placed under him. They have nothing to do with it."

The conductor, then, by the law of Ohio, is made the representative of the company in the management and control of the train.

If the Flint & Pere Marquette Railroad Co. had suffered loss and damage through that collision, and had brought an action against the Lake Shore company for their damages in consequence of it, we have no doubt that it might have been shown that their representative in charge of this train of theirs had himself been negligent in failing to acquaint the engineer who controlled the driving apparatus of the train with certain facts that would have enabled him, and would have put on him the duty, to exercise a different kind of care than that which he did exercise or feel called upon to exercise, in the light of the facts as he possessed them. If the engineer had known that No. 6, instead of passing eight minutes ahead of him, had passed but two minutes before, it then would have been his duty to obey a rule of the company which he said he knew, and which the conductor said he then knew, requiring all conductors and engineers running trains within the yard limits of Toledo upon the roads of the Lake Shore company, to have their trains under their control; and that, they testified, was such control as would enable

them to stop within the limits of their vision. And the limits of the vision of the engineer on this night in question, as he swears, and as all the evidence shows us, was that tunnel, that he did not see beyond it, and that he could not see beyond it, because there was smoke in it. So then, as I say, had he known that another train had passed ahead of him upon the same track within two minutes, it would have been his duty to have exercised a greater amount of care in running of his train than if he had rightfully supposed that the train had passed eight minutes ahead of him. We think the information received by the conductor was a necessary fact which the conductor should have given the engineer; for the conductor had instructed the engineer to use a greater degree of speed in order to catch No. 6 before it left at 5 o'clock. He should have communicated the additional fact that he then learned at Air Line Junction, that the train was several minutes late, or was only two minutes ahead of him on the track. We think that would have been sufficient negligence on the part of the F. & P. M. Company to have prevented its right of recovery against the Lake Shore. Can the conductor, the representative of the company, maintain an action for damages caused by the negligence of the Lake Shore Company? It seems to us not. It seems to us that his negligence was a contributing factor in that collision, whereby his company would have been liable in an action by its passengers, and which would have defeated his company in an action against the Lake Shore Company, if they had brought one; and that it will defeat him or his representative in an action brought against the Lake Shore Company. And it is upon that ground that we hold that this judgment and verdict is not sustained by the law and is contrary to the evidence in the case.

The judgment therefore will be reversed, and the cause remanded to the court of common pleas for a new trial.

*Potter & Emery*, for Plaintiff in Error.

*Hurd, Brumbach & Thatcher*, for Defendant in Error.